JOHN DOE, EX DEM. CURTIS MANN AND DOLPHUS HANNAH, PLAINTIFFS IN ERROR, *v.* WILLIAM WILSON.

In a treaty made with the Pottawatomie Indians in 1832, there were reservations to individual Indians, which should be selected under the direction of the President of the United States, "after the land shall have been surveyed, and the boundaries shall correspond with the public surveys."

Before this was done, one of these reservees made a conveyance by a deed in fee simple, with a clause of general warranty. In 1837, patents were issued for the reservations.

This deed vested the title of the reservee in the grantee. The former was a tenant in common with the United States, and could sell his reserved interest;

and when the United States selected the lands reserved to him, and made partition, (of which the patent is conclusive evidence,) his grantee took the interest which the reservee would have taken if living.

A prayer to the court that the land patented was not the same as that reserved was properly refused, because the recital in the patent was conclusive evidence to the contrary.

THIS case was brought up by writ of error from the Circuit Court of the United States for the district of Indiana.

It was an ejectment brought by Mann, a citizen of New York, and Hannah, a citizen of Iowa, against Wilson, to recover sections nine and ten, in township 35, range 4 west, in the county of Laporte, in Indiana.

The important question involved in the case may perhaps be more distinctly presented to the reader by a chronological order of events than by a recital of the titles offered upon the trial by the plaintiffs and defendant, respectively.

In October, 1832, treaties were made with the Pottawatomie Indians, by which the Indians ceded to the United States certain tracts of land therein described, except certain reservations to the Indians, amongst which was one to Pet-chi-co, of two sections. The language of the reservation was: "The United States agree to grant to each of the following persons the quantity of land annexed to their names, which lands shall be conveyed to them by patent." To Pet-chi-co two sections, &c., &c.

Then followed this sentence: "The foregoing reservations shall be selected under the direction of the President of the United States, after the lands shall have been surveyed, and the boundaries to correspond with the public surveys."

7 Stat. at L., 394, 395.

In February, 1833, Pet-chi-co made a deed to Coquillard and Colerick, with a general warranty, conveying "all of those two sections of land lying and being in the State aforesaid," &c., &c.

Before the lands were selected or located by the President, and before any patent issued, Pet-chi-co died.

In January, 1837, patents were issued to Pet-chi-co and his heirs for the two sections mentioned in the treaty. They re-

cited that, " whereas, by the third article of the treaty made in October, 1832, the United States agreed to grant to Pet-chi-co two sections; therefore," &c., &c.

In 1854, certain persons obtained a deed from the heirs of Pet-chi-co; and under this deed the plaintiffs below (who were also plaintiffs in error) claimed, upon the ground that the deed from Pet-chi-co in 1833 was invalid. Wilson claimed under the latter deed. The leading question in the case was, therefore, whether Pet-chi-co had a right to make the deed when it was made.

In the course of the trial below, many exceptions were taken respecting matters of evidence, and many prayers to the court made; in so much that the counsel for the plaintiffs in error, after many other points, enumerated twenty-six distinct causes of error. It is not necessary to mention these. The rulings of the Circuit Court upon the two following points are sufficient for the purpose of the present report:

4. If Pet-chi-co, between the ratification of the treaty and the issuing of the patents, sold and conveyed the land in controversy by a sufficient deed of conveyance, with covenants of warranty, to Coquillard and Colerick, and their assigns, then the patents when issued, as to the assignees, related back to and took effect from the ratification of the treaty.

5. If, before the issuing of the patents to Pet-chi-co, he had, by a legal and valid instrument, assigned to Coquillard and Colerick his interest in the lands which were to be granted to him under the treaty of October, 1832; and if Colerick had, in like manner, assigned his interest to Coquillard; and if Coquillard had, in like manner, assigned to Wilson, then, by virtue of the act of Congress of May 20, 1836, the patents when issued inured to the benefit of Wilson, and vested the legal title to the land in him, although Pet-chi-co may have died before its date.

The verdict being for the defendant, the plaintiffs brought the case up to this court.

It was argued by *Mr. Baxter* for the plaintiffs in error, and by *Mr. John B. Niles* for the defendant.

*Doe et al. v. Wilson.*

Without following the counsel through the branches of the case or the effect of the act of 1836, we can only state the positions assumed upon the point decided by this court.

*Mr. Baxter* said:

I. The third article of the treaty of the 27th October, 1832, was a mere executory promise of the United States, to grant in future and by patent to Pet-chi-co two sections of land, to be thereafter selected by the President. This promise was to be performed by the political department, and before its performance could create no inchoate title or estate in Pet-chi-co to any lands.

> Longlois *v.* Coffin, 1 Indiana Reports, 446.
> Verden *v.* Coleman, 4 Ind., 457.
> Haden *v.* Ware, 15 Ala., 158.
> Fipp *v.* McGehee, 5 Porter, 413.
> Johnson *v.* McGehee and Thomas, 1 Ala., 173, 174.

And this, being a mere executory promise, to be executed by the political department, was not assignable; and the effort was against public policy, and could convey no estate to the assignee, or give him any right to the land.

> Lampet Case, 10 Coke, 46 b, 48 a.
> Cruise, vol. 4, p. 174, title 32, chap. 6, sec. 46.
> Carleton *v.* Lughton, 3 Merivale, 670.
> Doe d. Brun *v.* Martin, 8 Barn. and Cress.; 15 Com. Law Rep., 283.
> 4th sec. act of July 22, 1790, 1 S. L., p. 138.
> 12th sec. act of 1802, 2 S. L., p. 143.
> Opinion of Mr. Taney on Treaty of 20th October, 1852, 2 Opinions, 588.
> Jackson *v.* Wood, 7 John., 294.
> Goodell *v.* Jackson, 20 Johnson, 706, 708.

*Mr. Niles* said:

The fourth instruction given by the court was as follows:

"If Pet-chi-co, between the ratification of the treaty and the issuing of the patents, sold and conveyed the land in controversy, by a sufficient deed of conveyance, with covenants of warranty, to Coquillard and Colerick, and their assigns,

then the patents, when issued, as to the assignees, related back to and took effect from the date of the ratification of the treaty."

This instruction announces a well-known principle, often affirmed by the Supreme Court, that all the several parts and ceremonies necessary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation.

> Cruise on Real Property, vol. 5, pp. 510, 511.
> Jackson ex dem. Forrest *v.* Ramsay, 3 Cow., 75.
> Landes *v.* Brant, 10 How., 348.
> Ross *v.* Barland, 1 Peters, 655.
> Lessee French *v.* Spencer, 21 How., 228

The doctrine of this instruction is strengthened in its application to this case by the act of Congress of May 20, 1836, above referred to.

In Landes *v.* Brant, the court say, that "in every case in which this court has been called on to investigate titles where conveyances of lands had been made during the time that a claim was pending before a board of commissioners, and where the claim was ultimately confirmed in the name of the original claimant, the intermediate assignments have been upheld against the confirmee, and his heirs and devisees, in the same manner as if he had been vested with the legal title at the date of the conveyance."

> 10 Howard, 348

Mr. Justice CATRON delivered the opinion of the court.

By the treaty of October 27, 1832, made by the United States, through commissioners, with the Pottawatomie tribe of Indians of the State of Indiana and Michigan Territory, said nation ceded to the United States their title and interest in and to their lands in the States of Indiana and Illinois, and the Michigan Territory, south of Grand river.

Many reservations were made in favor of Indian villagers jointly, and to individual Pottawatomies. The reservations are by sections, amounting probably to a hundred, lying in various parts of the ceded country. As to these, the Indian

title remained as it stood before the treaty was made; and to complete the title to the reserved lands, the United States agreed that they would issue patents to the respective owners. One of these reservees was the chief, Pet-chi-co, to whom was reserved two sections. The treaty also provides, that "the foregoing reservations shall be selected under the direction of the President of the United States, after the land shall have been surveyed, and the boundaries shall correspond with the public surveys."

In February, 1833, by a deed in fee simple, Pet-chi-co conveyed to Alexis Coquillard and David H. Colerick, of the State of Indiana, "all those two sections of land lying in the State aforesaid, in the region of country or territory ceded by the treaty of 27th October, 1832." The grantor covenants that he is lawful owner of the lands; hath good right and lawful authority to sell and convey the same. And he furthermore warrants the title against himself and his heirs. Under this deed, the defendant holds possession.

The lessors of the plaintiff took a deed from Pet-chi-co's heirs, dated in 1855, on the assumption that their ancestor's deed was void; he having died in 1833, before the lands were surveyed, or the reserved sections selected. And on the trial below, the court was asked to instruct the jury, "that Pet-chi-co held no interest under the treaty in the lands in question, up to the time of his death, that was assignable; he having died before the location of the land, and before the patents issued."

This instruction the court refused to give; but, on the contrary, charged the jury, that "The description of the land in the deeds from Pet-chi-co to Coquillard and Colerick, from Colerick to Coquillard, and from Coquillard to Wilson, are sufficient to identify the land thereby intended to be conveyed as the same two sections of land which are in controversy in this suit, and which are described in the patents which have been read in evidence."

It is assumed that the lands embraced by the patents to Pet-chi-co, made in 1837, do not lie within the section of country ceded by the treaty of 27th October, 1832; and therefore the

court was asked to instruct the jury that the defendants cannot claim nor hold the land as assignees of Pet-chi-co, by virtue of the treaty. The demand for such instruction was also refused.

There is no evidence in the record showing where the land granted by the patents lies, except that which is furnished by the patents themselves. They recite the stipulation in the treaty in Pet-chi-co's behalf; that the selections for him, of sections nine and ten, had been made, "as being the sections to which the said Pet-chi-co is entitled," under the treaty. The recitals in the patents conclude all controversy on this point.

The only question presented by the record that we feel ourselves called on to decide is, whether Pet-chi-co's deed of February, 1833, vested his title in Coquillard and Colerick.

The Pottawatomie nation was the owner of the possessory right of the country ceded, and all the subjects of the nation were joint owners of it. The reservees took by the treaty, directly from the nation, the Indian title; and this was the right to occupy, use, and enjoy the lands, in common with the United States, until partition was made, in the manner prescribed. The treaty itself converted the reserved sections into individual property. The Indians as a nation reserved no interest in the territory ceded; but as a part of the consideration for the cession, certain individuals of the nation had conferred on them portions of the land, to which the United States title was either added or promised to be added; and it matters not which, for the purposes of this controversy for possession.

The United States held the ultimate title, charged with the right of undisturbed occupancy and perpetual possession, in the Indian nation, with the exclusive power in the Government of acquiring the right. Johnson *v.* McIntosh, 8 Whea., 603; Comet *v.* Winton, 2 Yerger's R., 147.

Although the Government alone can purchase lands from an Indian nation, it does not follow, that when the rights of the nation are extinguished, an individual of the nation who takes as private owner cannot sell his interest. The Indian title is property, and alienable, unless the treaty had prohib-

ited its sale. Comet *v.* Winton, 2 Yerger's R., 148. Blair and Johnson *v.* Pathkiller's Lessee, 2 Yerger, 414. So far from this being the case in the instance before us, it is manifest that sales of the reserved sections were contemplated, as the lands ceded were forthwith to be surveyed, sold, and inhabited by a white population, among whom the Indians could not remain.

We hold that Pet-chi-co was a tenant in common with the United States, and could sell his reserved interest; and that when the United States selected the lands reserved to him, and made partition, (of which the patent is conclusive evidence,) his grantees took the interest he would have taken if living.

We order the judgment to be affirmed.