143   277
f144  [2]217

143   277
152   [2]306

143   277
s156  610
s156  619

HAMILTON v. AMERICAN HULLED BEAN CO.

1. EQUITY—FRAUD—BILL FOR RELIEF—PARTIES.
   Persons who are separately induced to subscribe for stock in a corporation by means of the same fraudulent representations, may unite in a bill praying identical relief.

2. SAME—CANCELLATION—ADEQUATE REMEDY AT LAW.
   A bill, praying the cancellation of a subscription to the capital stock of a corporation and for return of money paid thereon, on the ground of fraud, states a case within the jurisdiction of equity, notwithstanding the same facts might be pleaded in defense of an action on the subscription, and an action at law might be maintained for the money already paid. *Fred Macey Co.* v. *Macey*, ante, 138, followed.[1]

3. SAME—LACHES.
   Subscribers to the capital stock of a corporation, praying cancellation of their subscriptions on the ground of fraud, are not guilty of laches where they subscribed in September, 1901, first learned of the fraud in the latter part of October, 1903, and filed their bill February 29, 1904.

Appeal from Kent; Wolcott, J. Submitted December 7, 1905. (Docket No. 160.) Decided March 5, 1906.

Bill by James L. Hamilton and Henry T. Heald against the American Hulled Bean Company, Limited, and Charles D. Fuller to set aside the sale of certain shares of corporate stock on the ground of fraud. From an order sustaining a demurrer to the bill, complainants appeal. Reversed.

*Drew & Heald*, for complainants.

*Howard & Howard*, for defendant Fuller.

BLAIR, J. The complainants filed their bill of complaint in the Kent circuit court, in chancery, against the

---

[1] For false representations as ground for rescission of subscription to corporate stock, see note to *Fear* v. *Bartlett* (Md.), 33 L. R. A. 721.

American Hulled Bean Company, Limited, and Charles
D. Fuller, February 29, 1904. Defendant Fuller de-
murred to the bill of complaint, and the demurrer was
sustained in the lower court, and the complainants bring
the case here on appeal from the order sustaining the de-
murrer.

The bill of complaint states that: The defendant Ameri-
can Hulled Bean Company, Limited, is a partnership associ-
ation organized on or about June 19, 1901. In the latter
part of August, 1901, the company filed amended articles
which provided for a capital stock of $5,000,000, $3,000,000
of which was paid in, and the remainder was to be treasury
stock. No money was actually paid in but the $3,000,000
purported to have been paid in by the assignment of
letters patent issued by the United States of America
on March 12, 1901, to defendant Charles D. Fuller. Be-
tween August 28, 1901, when the amended articles were
filed, and September 4, 1901, all the subscribers to the
articles of association agreed that $500,000 of the treasury
stock should be perferred stock, and $1,500,000 common
stock, and that the $3,000,000 paid in by the assignment
of the patents should be common stock. On or about the
4th day of September, 1901, the defendant, American
Hulled Bean Company, Limited, entered into an agree-
ment with defendant Fuller to sell him $150,000 par value
of the treasury preferred stock, and a like amount
of the treasury common stock of the company, for the
sum of $75,000 in cash, and the assignment of his Cana-
dian patents on the process mentioned above, and as a
further inducement to him to purchase the same, agreed
to aid him in disposing of the stock at a profit to himself,
and in pursuance of the agreement it was understood that
Fuller would undertake to interest the general public in
the sale of the stock, and that he might solicit subscrip-
tions for preferred stock in the company in the name of
the company, offering two shares of the common stock as
a bonus with each share of the preferred stock, and it was
further agreed that he might represent that the preferred

stock was being sold only for cash and at 100 cents on the dollar, and that the company had authorized $100,000 of the preferred stock to be placed on the market, and it was further agreed that the subscription lists used in obtaining the subscriptions might state that the stock to be issued to and received by the subscribers should be treasury stock, and that there was in the treasury of the company $500,000 of the preferred stock, and $1,500,000 of the common stock of the company. It was further agreed that when the subscriptions were obtained by Fuller they should be filled by issuing to the subscribers stock from the block sold to Fuller, without the knowledge of the subscribers, and it was further agreed that the company should collect from subscribers obtained by Fuller the full amount of their stock subscriptions at par, and then, without their knowledge, should apply all amounts so received, *first*, in satisfying and canceling the purchase price of $75,000 to be paid by Fuller to the company, and thereafter all amounts in excess of that sum and the unsold portion, if any, of that block of stock was to be turned over to defendant Fuller. Fuller never paid in any part of the purchase price, except as it was paid by applying the amounts paid by the complainants and the other subscribers to stock on his debt to the company, and the scheme was conceived between Fuller and the company for the purpose of cheating, deceiving, and defrauding all the subscribers whom Fuller might secure by means thereof.

Shortly after this agreement was made between Fuller and the company, Fuller called upon the complainants at Grand Rapids, Mich., and solicited them to subscribe for preferred stock in the company, and represented to them the things which it was agreed between him and the company that he might represent, as stated above, and, in addition, he represented that he had invented a process for hulling beans, and that he had sold and transferred all his right, title, and interest in that invention, and everything else pertaining thereto which he might invent or

which might be secured by him, to certain persons in Battle Creek, Mich., for the sum of $100,000, and that the Battle Creek parties had sold back to him a one-fifth interest in the invention, and that he and his Battle Creek friends had organized the defendant company with a capital of $5,000,000, $4,500,000 of which was common stock, and $500,000 preferred stock, and that they had accepted from the company $3,000,000 in the stock of the company in full payment of all their right, title, and interest in their invention and patents on the same, and further represented that the entire $500,000 of preferred stock and $1,500,000 of common stock was in the treasury of the company, and that no part of the same had been issued or disposed of, and that the board of managers had authorized the placing on the market of not to exceed $100,000 of the preferred stock, at par, and that he was acting in behalf of the company in endeavoring to place the stock on the market, and that he was authorized by the company to give two shares of the common stock as a bonus with each share of treasury preferred stock. Fuller presented to complainants at that time a subscription agreement, and requested them to sign it. The subscription agreement contained the statement that the American Hulled Bean Company, Limited, had been organized with a capital stock of $5,000,000, $4,500,000 of which was common stock, and $500,000 of which was 7 per cent. preferred stock, and that all the preferred stock and $1,500,000 of the common stock was treasury stock. The subscription agreement further contained the terms of payment, which were par for the preferred stock. Complainant Hamilton signed the subscription agreement for 50 shares of the preferred stock, and 100 shares of the common stock, and agreed to pay therefor $5,000. Complainant Heald signed for 10 shares of preferred stock, and 20 shares of common stock, and agreed to pay therefor $1,000, and they both of them actually have paid in cash to the American Hulled Bean Company, Limited, the amount which they agreed to pay.

The bill of complaint expressly alleges that it was of the essence of said agreement that the preferred stock for which they subscribed and agreed to pay, and which was to be issued to them as above set forth, should be treasury stock, and that there should have been in the treasury of said company, at the time they made their subscriptions, $500,000 of preferred stock, and $1,500,000 in common stock of said company, and that all of said treasury preferred stock so disposed of should be sold at par for cash, and that they signed said agreement in reliance upon statements and representations of said Fuller, and the terms and conditions of said subscription contract, and believing the same to be true, that they should receive treasury stock, and that there was at that time $500,000 of preferred stock and $1,500,000 of common stock, not disposed of, in the treasury, and believing that the sums paid by them on said subscriptions would be used by said Hulled Bean Company in the development and furtherance of its operations. . If complainants had not relied upon the statements of Fuller and the statements contained in the subscription agreement, that the preferred stock for which they subscribed should be treasury stock, and that at the time they subscribed there was in the treasury $500,000 of preferred stock and $1,500,000 of common stock, and that all of the treasury stock to be disposed of should be sold at par for cash, they would not have signed the subscription agreement, nor would they have signed it if they had not supposed from the representations mentioned above that all the preferred stock and $1,500,000 of the common stock was undisposed of in the treasury, and that the sums paid by them and the others signing the subscription agreement would be paid into the treasury of the American Hulled Bean Company, Limited, and used by the company in the development and furtherance of its operations.   Complainants were entirely ignorant of the scheme and plan of the defendants, and if it had been made known to them, at the time they subscribed, that any part of the treasury stock had been disposed of

to Fuller or any one else for less than its par value in cash, or, instead of receiving treasury stock in fulfillment of their subscription contract, they were to receive stock from the block set apart for Fuller, or that the sums paid by them on the contract were to be applied, *first*, to satisfy a debt of Fuller to the company, and *second*, the balance to be paid to defendant Fuller, they would have absolutely refused to sign the contract or to invest any money in the company. This was known to Fuller and the company, but the facts were concealed from and misrepresented to complainants by the defendants for the express purpose of deceiving, cheating, and defrauding them and obtaining their money.

Defendant Fuller succeeded in securing subscriptions for the preferred stock of the company amounting to 850 shares, or $85,000. Fuller reported his success to the company and directed them to collect in the money and apply $75,000 on the cash payment which he was required to make by the terms of his contract with the company, and return the balance to him. The company agreed to do this. Complainants paid their subscriptions direct to the company, and it was applied, together with the sums of money received from other subscribers, in satisfaction of the debt of Fuller, of $75,000, to the company, and the balance in excess of that amount was returned to defendant Fuller, without the knowledge or consent of the complainants.

It is alleged and charged that the action of the officers and the board of managers of said Hulled Bean Company in applying and paying the funds received from the complainants and the other subscribers mentioned, in the matter aforesaid, constituted a gross violation of their duties to the members of the said company; that it was a wrongful and illegal diversion of funds belonging to said company; that it amounted to a fraud upon the complainant which, in equity, should vitiate and warrant cancellation of said subscription contract; and that the entire scheme and plan of said defendants, through the active

instrumentality of the said defendant Fuller, and the cooperation of the officers and board of managers of the Hulled Bean Company, was conceived and carried out with the intent and for the purpose of obtaining the money of the complainants under false pretenses, and with the intent and purpose to cheat, deceive, and defraud them. The payments of complainants on their subscriptions were never credited by the company on their subscriptions, and their subscriptions were never canceled, and complainants are still liable on their subscriptions to the company and will remain so until they are canceled. Complainants were ignorant of the arrangement between Fuller and the company until the latter part of October, 1903. At that time a committee of the stockholders went from Grand Rapids to Battle Creek, Mich., to investigate the affairs of the company in behalf of the complainants and other stockholders in the company. The committee returned and reported some of the facts mentioned above, and the report of the committee was the first intimation that complainants had of such agreement between Fuller and the company. Complainant Heald immediately wrote a letter to defendant Fuller, demanding repayment to him of $1,000, with interest, on account of the misrepresentations and fraud. Defendant Fuller came to Grand Rapids in response to the letter, and at that time complainant Heald offered to return his stock to Fuller, and demanded a return of his money. Fuller refused to do that, and stated that he did not consider himself liable either to complainant Heald or any of the other subscribers. Complainant Hamilton was kept informed of all the acts of complainant Heald in the premises. The complainants still hold, respectively, 50 and 10 shares of preferred and 100 and 20 shares of common stock in the company, and have deposited the certificates for the same in court, duly indorsed for transfer. It was further alleged that both the common and preferred stock was worthless at the time of filing the bill.

The complainants' prayer for relief is as follows:

"Your orators therefore ask the aid of the court in the premises:

"1. That the above-named defendants, the American Hulled Bean Company, Limited, and Charles D. Fuller, may appear and answer this, your orators' bill, without oath (answer on oath being hereby expressly waived), and that said Charles D. Fuller may come to a just and fair account touching the amount due to your orators for said money paid to him as aforesaid.

"2. That their subscription to said stock of the American Hulled Bean Company, Limited, may be canceled.

"3. That said defendant, Charles D. Fuller, may be decreed to accept said stock herewith deposited with said clerk and to pay forthwith to your orators the amounts which they paid for stock so transferred to them as aforesaid, with interest thereon from the dates of payment, together with your orators' reasonable costs and charges in this behalf sustained.

"4. And that your orators may have such other relief or such further relief in the premises as shall be agreeable to equity and good conscience.

"5. May it please the court, the premises being considered, to grant to your orators the writ of subpœna, to be issued out of and under the seal of this court, to be directed to the said American Hulled Bean Company, Limited, and Charles D. Fuller, defendants herein, and thereby commanding them and each of them, on a certain day and under a certain penalty to be therein inserted, personally to be and appear before this court, then and there to answer, all and singular, the said premises, and to stand to, abide and perform such order and decree as this court shall make therein and shall be agreeable to equity and good conscience. And your orators will ever pray, etc."

The defendants' demurrer reads as follows:

"Now comes the above-named defendant, Charles D. Fuller, by Howard & Howard, his solicitors, and says that the complainants have not stated such a case in their amended bill as entitles them to relief in a court of equity, for the following reasons:

"1. Because there is no equity in the amended bill.

"2. Because the allegations in the amended bill show that if the complainants are entitled to any remedy at all, it is in a court of law.

" 3. Because the allegations in the amended bill show that if the complainants ever had any right or claim for a rescission of their alleged contract, they have lost the same by their laches.

" 4. Because the complainants are not jointly interested. The allegations of the amended bill, if they show any rights at all in the complainants, show a several and individual right and not a joint right.

" 5. Because, under the allegations of the amended bill, the complainants are not entitled to any relief in a court of equity.

" 6. Because the amended bill sets up no ground for equitable relief."

The important questions for consideration in this case are, *first*, whether the complainants have such a community of interests as authorizes their joining in the bill of complaint; and, *second*, whether complainants have not such an adequate remedy at law as to oust equity of jurisdiction.

We think the first question must be answered in the affirmative. *Sherman* v. *Stove Co.*, 85 Mich 169; *Bosher* v. *Land Co.*, 89 Va. 455. It is true that in *Sherman* v. *Stove Co.* the complainants were, at the time of the subscription, partners in business, and the representations were either made to both at the same time or to one acting for both, and the money was drawn out of the partnership, but their interests in the corporation and in the shares of stock for which they subscribed were as several and distinct as in the case before us. It should make no difference in principle whether the representations are made to the prospective shareholders at the same time when they are gathered together or to them separately at different times, provided the representations are identical, the interests and subject-matter are identical, and the relief sought is identical. As said by the court in the case of *Bosher* v. *Land Co.*, supra:

" Where the parties allege in the bill that the fraudulent acts are exactly the same and perpetrated by the same means and the injury identical as to all, except only in

the amount of the injury—as where the same false statements are distributed to all and the same false and deceitful prospectus is operated upon all alike and all have been defrauded by the same means, and the relief sought is the same and the subject-matter identically the same—there is a community of interest and right and such persons may unite as coplaintiffs against the common wrong-doer."

Counsel for the defendants stated upon the oral argument in this court that the demurrer was sustained by the learned circuit judge upon the ground that complainants had an adequate remedy at law, thereby bringing the suit within the principle of *Mack* v. *Village of Frankfort*, 123 Mich. 421. The case last cited is distinguishable from the present in that complainants merely sought a money judgment and there was no prayer for cancellation or other relief peculiar to courts of equity. We think the case falls within the principle of *John Hancock Mut. Life-Ins. Co.* v. *Dick*, 114 Mich. 337 (43 L. R. A. 566). This question is discussed in *Fred Macey Co.* v. *Macey*, ante, 138, to which we refer for a full discussion of our own cases.

We do not think that the complainants were guilty of laches under the circumstances disclosed by their bill of complaint, and the order sustaining the demurrer is reversed, with leave to defendant to answer in accordance with the rules of court.

McALVAY, GRANT, HOOKER, and MOORE, JJ., concurred.